PROST, Circuit Judge,
dissenting.
The majority resists the Supreme Court’s unanimous directive to apply the patentable subject matter test with more vigor. Worse yet, it creates an entirely new framework that in effect allows courts to avoid evaluating patent eligibility under § 101 whenever they so desire. I too find it difficult to answer the questions presented here with absolute certainty. Nonetheless, I believe that precedent and common sense counsel that the asserted patent claims are abstract ideas repackaged as methods and systems. Thus, with respect, I dissent.
I
When it comes to subject matter patent-ability, we do not write on a blank slate. Just a few months ago, the Supreme Court reversed us in a § 101 case for a second time in its last three terms, hinting (not so tacitly) that our subject matter patentability test is not sufficiently exacting. Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012); Bilski v. Kappos, — U.S. -, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010); see also WildTangent, Inc. v. Ultramercial, LLC, — U.S. -, 132 S.Ct. 2431, 182 L.Ed.2d 1059 (2012), granting cert., vacating, and remanding Ultramercial, LLC v. Hulu, LLC, 657 F.3d 1323 (Fed.Cir.2011). The Court once again iterated that “the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.” Prometheus, 132 S.Ct. at 1294 (quoting Bilski, 130 S.Ct. at 3230). But this time the Court also made clear what had been written between the lines before: It is not sufficient to put an abstract idea into use with “[pjurely ‘conventional or obvious’ ‘pre-solution activity.’ ” Prometheus, 132 S.Ct. at 1298; cf. Bilski, 130 S.Ct. at 3231 (noting that the claimed invention was directed at a “fundamental economic practice long prevalent in our system of commerce”); Parker v. Flook, 437 U.S. 584, 594, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978) (“Respondent’s process is unpatentable under § 101, not because it contains a mathematical algorithm as one component, but because once that algorithm is assumed to be within the prior art, the application, considered as a whole, contains no patentable invention.”). The Court accordingly declined the Solicitor General’s invitation to leave the screening of low quality patents to § 102 and § 103, even though the government promised that “the claims are likely invalid under those provisions.” Brief for the United States as Amicus Curiae in Support of Neither Party at 9, Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. *1357 -, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012). Now there is no doubt that to be patent eligible under § 101, the claims must include an “inventive concept.” Prometheus, 132 S.Ct. at 1294.
The majority has failed to follow the Supreme Court’s instructions — not just in its holding, but more importantly in its approach. The majority does not inquire whether the asserted claims include an inventive concept. Even more fundamentally, the majority questions whether the Supreme Court’s abstract idea test is workable at all. Maj. Op. 1348-49. Based on this apprehension, I take it, the majority devises a new approach to subject matter patentability. We must now avoid deciding a § 101 case unless unpatentability is “manifestly evident.” Maj. Op. 1352.
I would be more empathetic if the majority’s approach was based on a case-specific determination, made upon the application of the Supreme Court’s abstract idea test to the asserted claims. As mentioned, however, the majority does not even attempt to inquire whether the claims disclose anything inventive. The bulk of the analysis focuses on the fact that the claims require “computer implementation,” which the majority itself deems insufficient to pass muster under § 101. Maj. Op. 1352-55. Nor is there any explanation for why the specific computer implementation in this case brings the claims within patentable subject matter. See also infra Part III. The majority merely posits that the additional limitations in the claims “can be characterized as being integral to the [invention],” but it does not explain whether they should be characterized as such, and what “integral” means in the context of § 101 in the first place. Maj. Op. 1355-56.
So why does the majority reverse the district court? Frankly, because “it is difficult to conclude that the computer limitations here do not play a significant part in the performance of the invention.” Maj. Op. 1355. That suggests that the majority’s “manifestly evident” standard is more of an escape hatch than a yardstick. In other words, the majority has resurrected the very approach to § 101 that the Solicitor General advocated — and the Supreme Court laid to rest — in Prometheus. I cannot agree.
II
Even if we were to punt the subject matter issue whenever it is difficult, we would not have any justification for reversing the district court in this case — especially on the method claims. The basic idea behind the claimed invention is the use of an intermediary in a financial transaction. At its most basic form, in a transaction between parties ‘A’ and ‘B,’ a middle-man collects funds from ‘A’ but will not pass them to ‘B’ until ‘B’ has also performed. In more complicated settings, the intermediary makes intelligent choices in selecting the parties to the transaction in a way to minimize or hedge the transaction risk. In any event, this basic idea of “credit intermediation” is not just abstract; it is also literally ancient. See Temin, Peter, Financial Intermediation in the Early Roman Empire (November 2002), MIT Department of Economics Working Paper No. 02-39, available at http://ssrn. eom/abstract=348103 or http://dx.doi.org/ 10.2139/ssrn.348103 (exploring the use of financial intermediaries in the Early Roman Empire).
So where is the invention? The majority states that it is not the computer implementation, but “the claims as a whole” that make the invention patentable. Maj. Op. at 1355. But setting any need for computer implementation aside, there is nothing in the method steps themselves that brings the invention within patentable subject matter. Stripped of jargon, representative method claim 33 simply breaks down the *1358 idea of a financial intermediary into four steps: (a) creating a debit and credit account for each party, (b) checking the account balances in the morning, (c) adjusting the account balances through the day, and (d) paying the parties at the end of the day if both parties have performed.[1] The claim in effect presents an abstract idea and then says “apply it.” That is not enough. Prometheus, 132 S.Ct. at 1294 (“[T]o transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words ‘apply it.’ ”).
The majority objects that “[i]t is impermissible for the court to rewrite claims as it sees them.” Maj. Op. 1353-54 n. 4. But that is precisely what courts do in claim construction everyday. Perhaps what the majority actually means is that the plain English translation in Table 1 somehow glosses over a limitation that would otherwise narrow the claims to something that is non-abstract. One would wish that the majority had not kept that limitation a secret. The only hint appears where the majority points to the phrase “shadow records,” as if that alone transmutes the abstract idea of the claims into patentable subject matter. Maj. Op. 1355-56. But the claims use “shadow” to simply define an account that is used to track a party’s payments (the account is a shadow of the party’s performance). That is not a limiting feature at all; any financial intermediation would in one way or another use a “shadow” account. Therefore, the representative method claim does not limit the method steps in a way that the Supreme Court considers to be meaningful. It merely recites the steps of performing as an intermediary in a financial transaction, which is an abstract idea, nothing more and nothing less. Cf. Bilski, 130 S.Ct. at 3231.
That leaves determining whether the computer implementation — assuming one *1359 is required by the method claims — makes the invention patentable. It does not. As the majority itself notes, “the mere fact of computer implementation alone does not resolve the patent eligibility question.” Maj. Op. 1355. Nor is there anything about the use of computers in the method claims in this case that brings them within patentable subject matter. In Gottschalk v. Benson, 409 U.S. 63, 65, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972), for example, the Supreme Court considered a patent “on a method of programming a general-purpose digital computer to convert signals from binary-coded decimal form into pure binary form.” Id. Most of the steps of representative claim 8 expressly required the use of a shift register, a form of digital computer. Id. at 73, 93 S.Ct. 253. Indeed, the Supreme Court emphasized that the conversion method had “no substantial practical application except in connection with a digital computer.” Id. at 71, 93 S.Ct. 253. That did not prevent the Court from holding, however, that the asserted claims were abstract. Id. at 72-73, 93 S.Ct. 253. More recently, we evaluated the patentability of a claim for “[a] computer aided method of managing a credit application” that recited a “display device” and “terminal devices,” which the district court correctly construed as some form of computer implementation. Dealertrack, Inc. v. Huber, 674 F.3d 1315, 1331-35 (Fed.Cir.2012). We nonetheless looked beyond the computer implementation to the inventive concept of the patent and held that the claim disclosed an abstract idea. Id. at 1333 (“Dealertrack’s claimed process in its simplest form includes three steps: receiving data from one source (step A), selectively forwarding the data (step B, performed according to step D), and forwarding reply data to the first source (step C). The claim ‘explain[s] the basic concept’ of processing information through a clearinghouse [and is therefore abstract].”); see also Fort Props., Inc. v. Am. Master Lease, LLC, 671 F.3d 1317, 1323-24 (Fed.Cir.2012) (holding that a claim limitation that required a computer to generate deedshares was abstract).
These authorities should have compelled us to hold that the asserted method claims in this case are abstract. The connection between the basic idea behind the claimed invention and the use of computers is not any stronger here than the relationship between the binary conversion system and the shift register in Benson, or the credit application system and computers in Dealertrack. Indeed, unlike in Benson and Dealertrack, the representative method claim does not even recite the use of a computer. And while some of the dependent claims recite computers, the specification shows that the use of computers is simply incidental. See also infra Part III. As I see it, therefore, the method claims do not present a difficult case. But district courts and litigants will now face a difficult task in deciphering the law and harmonizing precedent: What is it that sets Benson, Bilski, and Prometheus — and Dealertrack — apart from this case, and what legal principle justifies responding to a unanimous Supreme Court decision against patentability with even a stricter subject matter standard? I do not know, and I cannot find the answer in the majority opinion.
Ill
The system claims present somewhat of a closer question, in part because the Supreme Court has not decided a § 101 case that involves system claims. There is a perfectly reasonable argument that system claims are never abstract as a matter of law. After all, systems comprise objects, and objects are literally not abstract. A bright-line rule that brings all systems within patentable subject matter is also easy to comprehend and administer. *1360 Evaluating whether systems are abstract, on the other hand, may run the risk of stepping too far into making novelty and obviousness determinations under the guise of the abstractness test.
Nonetheless, I would affirm the district court on the system claims as well. To begin with, I do not believe that we are free to decide that system claims may never be abstract. The Supreme Court has warned that “patent eligibility [does not] ‘depend simply on the draftsman’s art.’ ” Prometheus, 132 S.Ct. at 1294 (quoting Flook, 437 U.S. at 593, 98 S.Ct. 2522). A bright-line rule would conflict with the Supreme Court’s admonition against putting form before substance in this area of patent law. More fundamentally, however, providing all system claims with immunity from the subject matter inquiry would eviscerate the abstract idea test altogether. Any method claim that uses a general purpose computer may also be drafted as a system (containing computers) that carries out the method. The close similarity between the representative system and method claims in this case provides a great example. Thus, I generally agree with the majority that the mere fact that a claim recites a system does not put it beyond the abstract idea test. Maj. Op. 1352.
Once we accept that system claims may be abstract, however, there is little room to suggest that the system claims in this case fall within patentable subject matter. As already mentioned, the Supreme Court has directed us to inquire whether the claim limitations that are added to the abstract idea are inventive. Of course, I do not understand that prescription as a permit to collapse the obviousness and novelty inquiries into § 101. But there are cases where we may simply consult the claims and the specification in order to conclude that the additions are mere pre or post solution activity. That is, there are cases in which we can easily tell that the invention is not about systems or computers; it is merely an abstract idea clothed as something more tangible. In those circumstances, we may not simply defer the threshold question of patentability to other provisions of the Act; rather, where the case squarely presents the issue, we must invalidate the patent under § 101. See supra Part I.
This is one such case. Apart from the abstract idea of avoiding transaction risk by using financial intermediaries, representative system claim 1 of the '720 patent recites 1) a computer memory that contains account balance information, and 2) a computer that can track the account balance. '720 patent eol.65 11.42-61. One need not be a computer scientist to suspect that this level of computer implementation is not inventive. But intuition is not our only guide; we also have the patent specification. The “disclosure of the invention” section of the '720 patent almost exclusively discusses the concept of risk minimization in financial transactions. Although it summarily states that “[t]he invention also encompasses apparatus ... dealing with the handling of contracts,” it does not mention what aspect of the apparatus is an advancement in the art. Id. col.5 11.27-29. Quite the opposite: it explains that the object of the invention can be “achieved by a computing/telecommunications infrastructure that is capable of being accessed worldwide by any enterprise/individual having access to a computer and a telephone network.” Id. col.5 11.47-50. The rest of the 65-column-long specification is similarly devoid of any teaching for how one must implement computer systems. For example, there is no instruction for connecting various components of the system and no discussion of how existing systems need be modified or improved in order to implement the one that is claimed. Indeed, even the “preferred embodiment” is not limited to a single system: Accord *1361 ing to the specification, the best mode of the invention may be implemented with “[a] large range of communication hardware products,” “[o]ne amongst many of [which] are personal computers and associated printers.” Id. eol.7 1.65-col.8 1.3. Other options include “a mini or mainframe computer,” “a tone dialing telephone,” or even “a voice connection via an operator.” Id. col.8 11.6-12. As far as an actual system is concerned, therefore, implementation is irrelevant — anything goes. Instead, the specification discusses at length and in painful detail various forms of transactions, contracts, order processing, order authorization, risk management, and other financial concepts. Even a quick glance at the '720 patent reveals that the claimed invention is not about physical systems; it is the abstract idea of risk-management in financial transactions carried out on an already known infrastructure. That invention, even if new, is an unpatentable abstract idea.
In sum, if we are to assess system claims for subject matter patentability— and I believe that we are currently so obligated — we must also follow the Supreme Court’s instructions on how the abstract idea test should be applied. That is, we must look beyond the non-inventive aspect of the claims and ask whether the remaining portion is an abstract idea. Following that approach, in my view, unavoidably leads to the conclusion that similar to the method claims, the asserted system claims are not patentable. Perhaps, the Supreme Court will reconsider its broad instructions in Prometheus once it considers system claims, but until then we would only add confusion and uncertainty by creating our own ad-hoc approach. I respectfully dissent.[2]

. Table 1:
[[Image here]]

. I am also of the view that the computer medium claims are not patentable under § 101. But since the majority has not addressed the issue separately, I see no need to discuss it.